Cunningham v. Cunningham Mr. Gill May it please the Court, my name is Mike Guile and I represent the appellants Terrance Cunningham, a U.S. soldier, and his mother, Glenda Cunningham, in this Hague Convention case. I think I'd like to start off, Your Honors, with the notice of supplemental authority that was filed by Appellee yesterday, which highlights Ovalle, a case that was decided before we started briefings. Because I think this case actually encapsulates the most important factor before the Court here today. In the Ovalle case, one of the critical issues was whether the habitual residence had ever been Florida for the child in question. The parties critically there, they had disputed whether or not, what was the purpose when the parties had initially moved to Florida. The appellant said this was because we were going to get married, we were going to raise a child in Florida, and the appellee in that case said no, this was more of a trial. They had both traveled, but he said that she left most of her material in Guatemala. So in that case, this Court had found that the District Court properly exercised its discretion. There was conflicting testimony about that move to Florida. So the Court credited the appellee in that case regarding that move to Florida, and then found thus there had been no habitual residence that was established in Florida. Now in contrast to that case, Ovalle, in this case it is undisputed that when the parties moved to Maryland, that they moved, they were already a married couple, that they had the settled, shared intent to raise their child here in the U.S. This is the most important factor in this case. Because once there is a habitual residence, once the parties have established some shared, settled intent regarding the children, then there are a variety of ways that that habitual residence can change. One way that it can change... But it's an odd thing in this case in one way, and that is that the parties made an But that also leads to the possibility that the parties can change their minds once the child is born. And isn't that essentially what the District Court concluded here? That whatever may have been the husband and wife's shared intent in March of 2015, by the time the child was born, that shared intent had changed dramatically because of all of the events that had taken place. Isn't that essentially what the District Court concluded? Respectfully, Your Honor, I think that's not quite what it concluded. It did conclude that the shared intent was regarding where the mother was going to live. And the focus was not on whether the parties actually had a shared intent regarding the child. Actually, what the District Court highlighted was that there was no reasonable expectation that Terrence Cunningham could have that wife would actually return with the child, and that he had no practical way to enforce his desire to have the child return to the U.S. But the questions of whether or not... But he also... But there are also some of the text messages in which... And they're a little hard to decipher because of the translation issue, of course. But some of the text messages indicate that he was agreeing, or at the very least, acquiescing in her moving back to Japan with the child. Well, Your Honor, if you're referring to the October 2015 series of events, the text message, you okay, you move to Japan, you choice text? Those and others. Those are some of them. Fair enough, Your Honor. For the October, there's a separate question, but to answer that question directly, there's no acquiescence, there's no discussion regarding the child. But at that point, the mother had not yet given birth, right? Oh, no, Your Honor. The text message I'm referring to was after the births, after the child got the American passport, American citizenship. In Japan? In Japan. In Japan. And then came back to the United States. But they came back purportedly for a wedding, right? Correct, Your Honor. According to her testimony, they came back for the wedding of his sister or his brother? Your Honor, not according to her testimony. The court found her testimony to be incredible. According to her, she came back to the U.S. solely for the purpose of having him see the child and to finalize divorce papers. So then it was his testimony that she came back for the wedding? That's correct, Your Honor. And the district court, in this case, and she... That's a temporary return, is it not? If you're coming here for a wedding that has a beginning point and an ending point and a presumption, it seems to me that you're heading back to where you came from. Yes, Your Honor. No, his testimony wasn't solely that there was a wedding. This testimony was that it was a reconciliation. And the district court said if it was a reconciliation, well, it was going to be short-lived because of the volatile relationship. But the important factor is that all this October, all this behavior takes place after the parties had initially had a shared subtle intent to raise the child in the U.S. Now, mother goes to Japan. But they had the shared... They had the shared intent. They go to live in Maryland in Army housing. And then all of these events occur, whomever you place the blame on. There were serious problems between the two of them. And at that point, it seems to me that whatever the parties had an intent about can certainly change. And at the end of the day, that's essentially what the district court concluded, right? That by the time the baby was born, by the time she had moved back to Japan, things had Yes, Your Honor. But there was no shared settled intent. And Apolli didn't testify about a shared settled intent, that they had agreed to abandon the previous habitual residence and establish a new one in Japan for the child. The focus that the district court and the judgment focuses on is entirely on the mother's move. And critically, it doesn't even... It doesn't define that they had a shared or agreed settled intent for the child to go back. It was that, yes, he agreed that mother could go back. And he certainly testified about his reasons, but the court is right. But that is why the fact that there was, at one point in this case, a habitual residence is so critical, because courts absent shared settled intent hold that a court has to be very slow to perceive that an actual habitual residence has been abandoned and that a new one has been established. Because otherwise... Isn't that what the judge did though? She considered all these facts, and she was four or five days hearing on this. She had made credibility determinations. She rejected some of your client's testimony, accepted some of it. Same with regard to the mother, accepted some, rejected others. And when put all these factors together, came to her conclusion that there was a shared intent for the mother and child, or the child not yet born, to go back to Japan, including his, part of the evidence would be his, helping her to go back to Japan. Your Honor, that is correct that the judge made certain findings. Critically, the judge found most of Appelli's testimony on the material issues for the Hague Convention inquiry to lack credibility. But the element of her finding was not a finding of fact. We argue it was a legal conclusion that because husband had agreed for wife to go back to Japan, because that was going to be indefinite, because he could have the hope for her to return, but it was not reasonable. It wasn't a reasonable expectation. These were all, these are all questions of not whether there's a shared subtle intent. It's a question of whether the court believed that it made sense or it was practical or it was effective for the appellant to have the hopes that he did. And the record evidence here, because the cases when they talk about making that analysis of whether or not habitual intent has truly been abandoned, the case law establishes that well, the record evidence has to unequivocally point toward that abandonment. And in this case, the record evidence did precisely the opposite. Notwithstanding Appelli's reasons for coming back, which in the court found Appelli's testimony regarding the reason to lack credibility. Well, the fact of the matter was, is that this child, they continued to have communications while they were in Japan. The appellant continued to pay. Appelli affirmatively took the steps to make sure that she got American citizenship for this child, the social security card, the passport. And within a couple of months of the child's birth, she's buying one-way tickets for her, the child, and her adult teenage son to return to the marital home in Maryland. Now, she had a different testimony at trial, which the court found to lack credibility about why her purpose was coming back. But the reason why it's important is because once there is that settled intent for habitual residence, the courts allows to just find that it's changed. Because parties are often volatile. I don't think there's any Hague Convention appeal that doesn't involve a relationship that turned volatile. Otherwise, there wouldn't be the litigation and the appeal that resulted. But when they look for that shared, settled intent, we have a case where here, unlike a he said, she said for Maryland, it was absolutely undisputed that they had had a shared, settled intent to raise a child in the U.S. Now, as far as going back, mother has her testimony one way, and appellant had his testimony another way. But either way, they didn't have the shared intent to raise a child in Japan. Even if mother did. But in that case, then, the court would have to look at the record evidence. Well, do we have unequivocal evidence of abandonment? But isn't there also evidence that his chain of command didn't want her coming back and was concerned about her coming back? And wasn't that a fact that the district court was able to focus on or at least consider? Well, there's evidence of the chain of command. But Your Honor, I'd argue that regardless of whether the chain of command wanted the That doesn't go to the question at all of whether the husband had a settled expectation. No, but it goes to the question of why, in part, he acquiesced in having her sent back to Japan. That is correct, Your Honor. Yes. As a junior enlisted man here with the chain of command that got involved very quickly on that decision for her to return. And his own testimony about his return, his concern because she had previously had a miscarriage and she was obviously making serious allegations, obviously wanted to return to Japan. Those were reasons, yes, that contributed to his going back. But they don't speak to the separate question of was this a shared, settled intent by the parties to abandon altogether the U.S. as the place to raise the child? Your Honor, I see I'm into the rebuttal time. Yes.  Thank you. We'll hear from Ms. Crack. Okay. Kathleen Crack of Shetson Bowen, appearing pro bono on behalf of Apolli Riopo Cunningham. Just to start, the threshold issue here in this case, as explained by the trial court judge, is whether and how the initial habitual residence was formed. And where the father takes issue is that although the trial court used the same last shared intent analysis that the father, the same sort of analysis that the father wants to use, the father urges a different application of the test. And the problem with the way the father wants to apply the last shared intent is that it doesn't fit neatly with the facts of this case. And as the Hague tells us, habitual residence determinations are exceptionally factually explicit. And the trial court recognized and noted in her order that when she was looking to the cases that used the last shared intent analysis, that it didn't readily apply to this because those cases evolved from cases involving children who had an initial habitual residence, which then later shifted, which of course is different from what we have here, because the initial question is, how was the habitual residence initially established? And in the father's argument, continues to say that, just glosses over and suggests that the United States has to be the initial habitual residence, and bases that on an argument that once the shared intent was made in March of 2015, the deal was done, the die was cast, and it couldn't be undone unless the father agreed otherwise. And the fact remains that when you're dealing with this unique, factually unique case, that test doesn't apply the same way. It can't be applied the same way, because as Your Honor pointed out earlier, this is different in that the child had not yet been born. And when you look at the Hague case, you recognize from the text that the Hague contemplates trying to address situations where there has been a family unit that has broken down and someone is trying to move a child across the nation. And in fact, in Holder, they specifically note, and it's one of the cases that's relied upon by the father, is that the convention's concerned with the situation where the child is taken from a family and social environment in which its life has developed. That presupposes that the child has actually been born. You can't have social development until you've been born. But Mr. Cunningham's argument, I think, is a little bit different. I mean, I don't think I agree with all of it, but his argument is, even the district court found that as of March of 2015, when they first moved to Maryland, despite the turbulent relationship, they both believed and thought and agreed that the child would be born and live in the United States, right? The district court made that initial finding. Correct. His argument, I think, is almost tantamount to saying, after that shared intent was reached, this is the unilateral move of one of the parties. And the unilateral move of one of the parties can't destroy what had previously existed as shared intent. That's essentially the argument. Correct. So tell me why you think that that's either incorrect, either as a factual matter or as a legal one. Well, as a legal matter, because he's trying to apply the last shared intent to a factually distinguishable situation. The case is all evolved from when you were looking at whether or not a habitual residence has been shifted. And this court in Obaye recognized the distinction between the criteria to establish an initial habitual residence versus the one required to shift one. It's not in any dispute. I mean, the case law is clear. If you're trying to shift a habitual residence, there's much higher burden. But for purposes of establishing an initial habitual residence, this court recognized that if it's too burdensome, then you're going to have a child who can never acquire a habitual residence. And then it's going to open the door for the parents to play what it referred to as abduction ping pong with the child. And so they're factually distinct. So you've got the last shared intent test or analysis, but you can't apply it in the same fashion. And so the trial court did not. She applied it to the facts of the case presented to her. And in the facts of that case, as this court already noted a moment ago, that shared intent was long since gone by the time the child was born. And so when the mother went back to Japan, it was mutually agreed the mother would go back to Japan. And what's more, when she returned back to Japan, she returned to a country that she had spent her entire life in from the time she was born and was raised to raising her teenage son and their young child for all but two weeks of the failed relocation attempt back in Maryland. So factually unique from the other cases that deal with the last shared intent analysis when it's applied to a child that's been born abroad. It's difficult to see where, and the trial court recognized that when the mother went back to Japan, she reestablished her residency with Japan. She notified the local authorities. Prior to going over in March, she had told them she was moving to the United States. When it was agreed that she was going back to Japan, she notified them that she was back. She resumed employment. She readily resumed the social structure that she had had for 30-plus years in Okinawa. She resumed the residence that she had been sharing with family members. So by the time the child was born, she already had that already in play and just picked up where she had left off for all but two weeks over in Maryland. And when the child was born, she went and secured benefits for the child, health care for the child, and started raising her child there. So for purposes of what Obaye says in terms of establishing an initial habitual residence, and also Delvoy for that matter, you look to see when the child is, if the child is born, that they have had a chance to be in a country on some footing of stability. And certainly where a mother goes back to the country she had spent her entire life from, with the exception of those two weeks of the failed relocation effort, there is that footing of stability. So when the trial court was looking at it from the last shared intent analysis, the last shared intent of the March 2015 for the child to be born and raised there was long since gone and had been replaced by a shared intent for her to return. So in terms of applying it, she had to apply it to the facts that presented in the case that we had. So it cannot be applied in the same fashion that the father urges because it would be inconsistent with the Hague Convention. Again, the Hague Convention doesn't contemplate, when you look at the plain text of it, there's nothing in the text of the Hague to suggest it ever intended to impose a habitual residence on a child for a country that he's never been to. So you also look at the other cases that recognize that a child, when they're born to conflict, that the child shouldn't be deemed to have a habitual residence of a country that he's never been to. And by the time the child was born in this case, she was back in Japan in a country on some footing of stability. So then the question became, for the trial court, she had two separate time frames to be dealing with. March of 2015, she already addressed it. So now she's dealing with October of 2015. The parties had a lot of back and forth in terms of different versions of events. But ultimately, the trial court correctly found, looking at the overall evidence, that if nothing else, there was an agreement that she was going to be going back to Japan on October 12. And it wasn't until he met privately with his mother for over a half hour that he suddenly sends her a text that says, you can't have my baby. Baby says goodbye. Go home. No go home, no goodbye. And the court readily recognized that as the very sort of conduct that the Hague tries to deter, that Article 17 speaks against, which is that you're not supposed to go and child. If the father did not want the child going back to Japan, he had an option. He had a legal recourse. Contrary to what counsel has been saying, he had an option. He could have filed a petition under the Hague. But you can imagine how that might have been greeted when you're dealing with this factually unique situation of a child who's not yet been born. And again, you're faced with the reality that the Hague was never intended to address a that's broken before the first child's ever been born. You need only go look back at all of the cases that are cited by counsel. Again, the last shared intent analysis evolved from cases dealing with the shifting of an established habitual residence, which was not the case here. The threshold issue was finding the child's habitual residence. And their entire argument is premised on the notion that the child's habitual residence had to be the United States because they had an agreement back in March of 2015. The die was cast. The deal was done. It's written in stone and you can't change it unless I agree. And that is not what the Hague says. I preserve the rest of my time. Wait. Let me finish that. Your Honors, the shared intent was long since gone by birth. That is 100% correct and that's why the cases of Uzo and this court's decision in Sewell are so important because they look at the question of habitual residence and habitual residence whenever there's been a breakdown in the relationship. And in Sewell, the reason why the district court had found and this court had affirmed that the habitual residence had changed from the U.S. to Germany was because in the two and a half years after the child's birth, the parties had obviously come to a shared  But the district court, the magistrate's ruling had been that if he was looking at it at birth, he would have agreed that yes, the last shared intent had been for the U.S. There was no shared intent by the time the child was born. So at that point in the case, had there been a Hague Convention petition filed, the habitual residence would have been the U.S. As far as the appellant could have filed a petition, well, there would have been no way for an appellant to file a petition under the Hague Convention while mom was simply pregnant with a child. That period of March and April, it's a very quick flicker flash of a moment, but I respectfully disagree with the assertions that with mom saying, I'm going back to Japan, with the chain of command saying, she's going back to Japan, and with the husband saying, okay, go back to Japan for now, that at that point, he should have or could have filed a Hague Convention for relief. I have a question. You said, the husband said, go back to Japan, and you added, for now. Where is the evidence that he said, for now? Well, his testimony was that he expected it to be temporary. He expected her to get... At the time this occurred, in other words, going back to the time where the Army got her ticket, one-way ticket back to Japan, where is the evidence that the for now? Just solely his testimony, Your Honor. There's no independent evidence. Well, it's testimony after the fact. Yes, Your Honor. That's the problem. Correct. Which is... There's no evidence, as I understand it, of the conversation when she got on the plane as it were. Yes, Your Honor, and I think that focuses on the key point why courts are so loath to find a change in habitual residence in the first place, because this is going to turn into evidence after the fact. So if the parties initially have a shared intent, well then, yes, there are... Your Honor, our position has never been the die is cast, that's it, period. Shared intent can change. The parties can together agree to a different shared, settled intention, or absent that shared intent, there must be... For the shared intent where there must be a meeting of the minds regarding the child's habitual residence. That's in Berezovsky and in other cases that I cited. But absent that shared intent, there can still be a change in habitual residence, but it takes the passage of time, for instance, or unequivocal, sorry, record evidence that unequivocally points to abandonment of the prior residence. It's not just another party's after-the-fact testimony. Otherwise, the rule is just, it simply amounts to counsel's assertion that, well, the child must... It must have been Japan because the child was born in Japan. At the time the child was born, the child, there was no shared, settled intent anymore. The previous shared intent was the U.S. Mr. Gail, let me see if I can summarize your argument. Your argument is this is an issue of law, not a fact. Because there's no evidence, none whatsoever, with regard to the establishment of either the initial or a changed habitual residence in Japan. Because if there were a material fact dispute, then we would have to, unless the lower court abused her discretion, we would have to affirm. Primarily a matter of law, yes, Your Honor. A matter of law because there is no disputed fact or evidence that would establish a disputed fact. That's your basic argument, right? Not quite, and I apologize for my lack of clarity. May I finish answering Your Honor's question? If this is a case where the wife had testified, and I'm sorry, the appellee had testified according to the way the district court believes that things happened, that would be one thing. If it was just a matter of weighing testimony and making a determination, yes, that's the court's discretion. Here, the court found most of her testimony on these critical issues to lack credibility, but erroneously applied the law. But the judge relied on all of the evidence, including emails and tickets and things like that. It wasn't just the wife's testimony, and she didn't. The lower court rejected some and accepted others of her testimony, right? That is generally correct, yes, Your Honor. Thank you. Thank you, Dick. You've taken this case pro bono, I believe. We appreciate your having done that for the client and the court. Court will be in recess until 9 in the morning.